**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRACI LIVELY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>CRICKET WIRELESS, LLC<br><br>Defendant. | Case No.:<br><br>CLASS ACTION COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Traci Lively ("Plaintiff Lively" or "Plaintiff") individually and on behalf of all others similarly situated, through undersigned counsel, hereby alleges the following against Defendant Cricket Wireless, LLC ("Cricket" or "Defendant"). Facts pertaining to Plaintiff and his personal experiences and circumstances are alleged based upon personal knowledge, and all other facts herein are alleged based upon information and belief, *inter alia*, Plaintiff's counsel's investigation.

## NATURE OF THE ACTION

1. This is a class action for damages with respect to Cricket Wireless, LLC for its failure to exercise reasonable care in securing and safeguarding consumers' Private Information ("PI" or "Private Information")—including phone numbers, the phone numbers of consumers' contacts, the duration of the phone calls, and the number of calls and text messages.

2. This class action is brought on behalf of consumers whose PI was stolen by cyber-criminals in a cyber-attack against Cricket's third-party cloud platform, Snowflake, that took place

between May 1, 2022, and October 31, 2022, and January 3, 2023, resulting in the access and exfiltration of consumers' Private Information (the "Data Breach").

3. Upon information and belief, approximately 10 million Cricket consumers were affected by the Data Breach.

4. Cricket reported to Plaintiff and members of the putative "Class" (defined below) that information compromised in the Data Breach included their Private Information.

5. As a result of the Data Breach and Defendant's failure to promptly notify Plaintiff and Class Members of the Data Breach, Plaintiff and Class Members have experienced and will experience various types of misuse of their PI in the coming months and years, including but not limited to, unauthorized credit card charges, identity theft, and other fraudulent use of their Private Information.

6. Accordingly, Plaintiff assert claims for negligence, breach of implied contract, unjust enrichment, invasion of privacy, unauthorized disclosure of customer proprietary information, the District of Columbia Consumer Protections Procedures Act, and declaratory and injunctive relief.

## PARTIES

### A. Plaintiff Traci Lively

7. Plaintiff Lively is a resident and citizen of the District of Columbia and brings this action in his individual capacity and on behalf of all others similarly situated.

8. Plaintiff Lively has been a Cricket consumer since 2022.

9. On July 16, 2024, Plaintiff received Cricket's notification later informing him of the Data Breach and that his Private Information was affected. In the letter, Cricket said that Plaintiff's (and other consumers') "call and text records were accessed by cyber-criminals…"

Cricket also described the impacted data as "the phone numbers of your calls and text interactions….including counts of those calls/texts and total call durations for specific days or months."

10. Plaintiff has since spent countless hours, including but not limited to: monitoring his credit and bank accounts, addressing multiple fraudulent attempts on his Private Information, and finally taking legal action.

11. For example, unauthorized parties have attempted to obtain loans and numerous unauthorized financial accounts in Plaintiff's name since January 2023.

12. Additionally, a cyber-criminal made an unauthorized withdrawal from Plaintiff Lively's bank account on September 10, 2024.

13. In fact, the misuse of Plaintiff Lively's Private Information is so pervasive that an unauthorized user recently attempted to use Plaintiff Lively's newly acquired credit card in Peoria, Arizona.

14. To date, Plaintiff has also received notifications from Credit Karma that there have been approximately ten (10) inquiries into his credit in furtherance of opening unauthorized accounts and loans.

15. These inquiries indicate that Plaintiff Lively's Social Security Number, in addition to other personal data, is being exploited ad nauseam.

16. Prior to 2022, Plaintiff had never received such notifications, nor has he suffered from the misuse of his Private Information resulting in identity theft and fraud, as described above.

17. Plaintiff Lively has faced and will continue to face a certainly impending and substantial risk of a slew of future harms, fraud, and identify theft because of Cricket's ineffective data security measures, as further set forth herein.

18. Some of these harms will not materialize for months, or even years after the Data Breach, rendering Cricket's notice letter woefully inadequate to prevent the fraud that will continue to occur through the misuse of Plaintiff's Private Information.

19. Plaintiff Lively greatly values his privacy and would not have paid the amount that he did to receive services from Cricket had he known that the wireless provider would negligently maintain his Private Information as it did.

**B. Defendant Cricket Wireless, LLC**

20. Defendant Cricket Wireless, LLC, is a Delaware limited liability company with a principal office located at 1025 Lenox Park Boulevard, NE, Atlanta, Fulton County, Georgia 30319. Cricket provides wireless telecommunications services to over ten million subscribers and has locations across the United States. Cricket also maintains at least one (1) brick and mortar retail location in the District of Columbia and provides services to countless citizens thereof.

21. Cricket is a subsidiary of the telecommunications giant, AT&T, Inc.

## JURISDICTION AND VENUE

22. The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class Members, (b) at least one Class Member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

23. The Court has personal jurisdiction over Defendant as Cricket has purposefully availed itself of the laws, rights, and benefits of the forum state by registering to do business and selling products and/or services within this District, Defendant has sufficient minimum contacts with the forum state such that jurisdiction in this District is proper, and the events giving rise to Plaintiff's claims occurred therein.

24. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and Cricket is subject to personal jurisdiction therein.

## FACTS

25. Cricket is a wireless telecommunications provider, primarily offering mobile phone plans. As part of its business, Cricket is routinely entrusted with and therefore obligated to safeguard the Private Information of its consumers in accordance with all applicable laws.

26. In April 2024, Cricket discovered that consumer data was illegally downloaded from Snowflake, its third-party cloud platform between May 1, 2022, and October 31, 2022.

27. Specifically, Cricket claims that the compromised data includes files containing records of calls and texts of nearly *all* of Cricket's 10 million consumers during the aforementioned period contained within Snowflake. Cricket also announced that records from January 2, 2023 (for an alleged significantly smaller number of consumers) were also impacted.

28. But this is not the first time that Snowflake has been targeted by cybercriminals.

29. Upon information and belief, in early 2024, cybercriminals discovered the prevalence of Snowflake in major companies and that these entities upload enormous amounts of consumer Private Information on the platform.

30. Upon information and belief these companies, like Cricket's parent company, AT&T, have saved the previously mentioned consumer data to Snowflake without requiring multi-factor authentication ("MFA") to access the Private information contained therein.[1]

31. Moreover, the credentials pilfered from Snowflake platforms have been used in

---

[1] Cricket's parent company, AT&T, recently suffered a massive breach of its cloud platform. *See* *Crooks Steal Phone, SMS Records for Nearly All AT&T Customers – Krebs on Security*

furtherance of cyberattacks against Neiman Marcus, Ticketmaster, Santander, Advance Auto Parts, Lending Tree, and many others.

32. Upon information and belief, Cricket's Snowflake platform did not require MFA to access its consumers' Private Information, despite Snowflake making multi-factor authentication available to Defendant.

33. Upon information and belief, Cricket suffered from a ransomware attack.

34. In or around July 2024, approximately two (2) months after it learned of the Data Breach, Defendant announced that it suffered a cyberattack that allowed an unauthorized individual to obtain the Private Information of its consumers stored within Snowflake.[2]

35. Defendant offered no explanation for the delay between the initial discovery of the Data Breach and the belated notification to affected consumers, which resulted in Plaintiff and Class Members suffering harm they otherwise could have avoided had a timely disclosure been made.

36. Cricket's notice of the Data Breach was not just untimely but woefully deficient, failing to provide basic details, including but not limited to: how the unauthorized party accessed the platform, whether the information was encrypted or otherwise protected, how it learned of the Data Breach, whether the breach occurred in other systems, whether servers storing consumer information were accessed, and how many consumers were affected by the Data Breach. Even worse, Cricket declined to offer victims any assistance to mitigate the likely and anticipated consequences of the Data Breaches, such as credit monitoring services.

---

[2] *See* Cricket Addresses Illegal Download of Customer Data | Cricket Connection | Cricket Wireless

37. Because the Private Information was specifically targeted by cybercriminals with the intent to steal and misuse it, it is reasonable to assume that Plaintiff's and Class Members' PI is being sold on the dark web, meaning that unauthorized parties have accessed, viewed, and exfiltrated Plaintiff's and Class Members' PI subsequent to the original Data Breach.

38. The Data Breach occurred because Cricket failed to take reasonable measures to protect the PI it collected, stored, and profited from. Among other things, Defendant failed to implement data security measures designed to prevent this attack, despite repeated warnings to the telecommunications industry and associated entities about the risk of cyberattacks and the highly publicized occurrence of many similar attacks in the recent past on other wireless telecommunication providers.

39. Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff and Class Members' PI was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data. As a result, the PI of Plaintiff and Class Members was compromised through unauthorized access that lasted nearly six (6) months. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe.

## A. Defendant Failed to Maintain Reasonable and Adequate Security Measures to Safeguard Consumer Private Information

40. In furtherance of its business, Cricket acquires, collects, and stores consumers' PI.

41. According to the Cricket Wireless Privacy Policy ("Privacy Policy"), consumer information is used to create engaging and customized experiences and offer new or improved

products and services, design and deliver advertising and marketing campaigns to customers and measure their effectiveness, and customize advertisements, articles, videos, and market materials.

42. By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class Members' Private Information, Cricket assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff and Class Members' Private Information from disclosure, particularly considering the increasing prevalence of sophisticated cyber-attacks.

43. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant (and any of its affiliates) would comply with the obligation to keep such information confidential and secure from unauthorized access.

44. Prior to and during the Data Breach, Cricket promised its consumers that their Private Information would be kept confidential.

45. Cricket's Privacy Policy reaffirms its alleged dedication to safeguarding consumers' PI, to wit: "….we work hard to safeguard your data using a range of technological and organizational security controls. We maintain and protect the security of computer storage and network equipment, and we use security procedures that require employees to authenticate themselves to access sensitive data. We also limit access to personal information only to those with jobs requiring such access. . . .We take steps to ensure that data is processed according to this Policy and to the requirements of applicable law of your country and of the additional countries where the data is subsequently processed."

46. Moreover, Defendant's failure to provide adequate security measures to safeguard consumers' Private Information is especially egregious because Cricket operates in an industry

which has recently been victimized by scammers attempting to fraudulently gain access to consumers' Private Information.[3]

47. As a result of Cricket's failures, Plaintiff and Class Members face a substantial risk of future harm, including excessive spam, phishing, or other attacks. Thus, this substantial risk of additional fraud caused by the Data Breach constitutes a redressable injury traceable to Cricket's conduct or lack thereof.

48. Despite Cricket's claim that personally identifiable information was not included in the Data Breach, Plaintiff and Class Members now face increased risk of further harm.

49. Considering the nature and sophistication of the instant attack and the ability of cyber-criminals to link the consumer information stolen in the Data Breach with consumer data available from other sources, it is reasonable for Plaintiff and the Class Members to assume that their Private Information was provided to other criminals in furtherance of future identity theft and fraud-related crimes.

50. The significant risk of future harm resulting from the Data Breach that Plaintiff and Class Members now encounter is sufficiently concrete, particularized, and imminent. As such, immediate mitigation of the risk is required. Thus, Plaintiff and Class Members have spent, and will continue to spend additional time attempting to mitigate the repercussions of the Data Breach.

51. Notably, the Federal Trade Commission has recommended the following steps that data breach victims should take: (i) contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity); (ii)

---

[3] For example, T-Mobile suffered a massive cyber-attack that affected millions of its customers in 2021. *See* https://www.t-mobile.com/news/network/cyberattack-against-tmobile-and-our-customers. AT&T also reported a data breach affecting millions of its consumers in 2021. *See* https://about.att.com/story/2024/addressing-data-set-released-on-dark-web.html

regularly obtaining and reviewing their credit reports; (iii) removing fraudulent charges from their accounts; (iv) closing new accounts opened in their name; (v) placing a credit freeze on their credit; (vi) replacing government-issued identification; (vii) reporting misused Social Security numbers; (viii) contacting utilities to ensure no one obtained cable, electric, water, or other similar services in their name; and (ix) correcting their credit reports.[4]

52. To prevent cyberattacks like the one involved here, Cricket could and should have implemented ISO 27017, which is part of the ISO/IEC 27000 family, an information security framework for organizations using cloud services (i.e., Snowflake). The standard advises both cloud service customers and cloud service providers, with the primary guidance laid out side-by-side in each section.

53. Specifically, ISO/IEC 27017 is a standard that focuses on addressing the data privacy and security requirements for organizations using cloud services. An overview of the standard is as follows:

a. Scope: ISO/IEC 27017 provides guidance to cloud service customers on the implementation of information security controls within the context of their use of cloud services. It complements the existing ISO/IEC 27001 standard, which is a broader information security management system (ISMS) standard.

b. Objectives: The standard aims to help organizations protect the confidentiality, integrity, and availability of their information in the cloud environment. It provides guidelines for addressing the risks associated with cloud computing and ensures that cloud service customers maintain control over their data.

c. Data Classification & Handling: ISO/IEC 27017 emphasizes the importance of classifying data based on its sensitivity and defining appropriate handling and security measures for each classification. It provides guidance on data encryption, access controls, data segregation, and data retention.

d. Security Responsibilities: The standard clarifies the division of security responsibilities between the cloud service customer and the cloud service provider. It outlines the areas where the customer retains control and where the provider assumes responsibility. This helps establish clear expectations and accountability for security measures.

e. Supplier Management: ISO/IEC 27017 emphasizes the need for cloud service customers to assess the security capabilities of their cloud service providers. It provides guidance on selecting trustworthy providers, establishing contractual agreements, and monitoring the provider's compliance with security requirements.

---

[4] See Federal Trade Commission, Identity Theft.gov, https://www.identitytheft.gov/Steps

f. Incident Management: The standard addresses incident management processes in the cloud environment. It provides guidance on incident reporting, investigation, and response to ensure timely and effective handling of security incidents.

g. Continual Improvement: ISO/IEC 27017 promotes a continual improvement approach to information security in the cloud. It encourages organizations to regularly review and update their security controls, assess emerging risks, and implement necessary improvements.

54. In addition, ISO/IEC 27017 provides guidance on multi-factor authentication (MFA) as a security control for cloud service customers. The standard provides, among other things, the following security requirements:

a. Authentication Requirements: The standard emphasizes the importance of strong authentication mechanisms for accessing cloud services. It recommends the use of MFA as an effective method to enhance the security of user authentication. MFA requires users to provide multiple forms of identification, such as a password and a unique code or biometric factor, to verify their identity.

b. Risk Assessment: ISO/IEC 27017 encourages cloud service customers to conduct a risk assessment to determine the level of authentication controls required based on the sensitivity of the data and the potential impact of unauthorized access. MFA is often recommended for high-risk or sensitive applications or data.

c. Access Controls: The standard provides guidance on implementing access controls in the cloud environment. It suggests that MFA should be used as an additional layer of security in conjunction with other access control measures such as strong passwords, role-based access control (RBAC), and least privilege principles.

d. User Management: ISO/IEC 27017 highlights the need for effective user management practices in the cloud. It recommends implementing MFA for user accounts with administrative privileges or access to sensitive data. This helps prevent unauthorized access even if the user's password is compromised.

e. Supplier Management: The standard advises cloud service customers to assess the authentication capabilities of their cloud service providers. It recommends selecting providers that offer robust MFA options and have appropriate controls in place to protect customer data.

f. Compliance Monitoring: ISO/IEC 27017 suggests that organizations should monitor and review the effectiveness of their MFA controls regularly. This includes monitoring user access logs, analyzing authentication success/failure rates, and promptly addressing any security incidents or vulnerabilities related to authentication.

55. By addressing MFA in these ways, ISO/IEC 27017 helps cloud service customers, like Cricket, strengthen their authentication processes, reduce the risk of unauthorized access, and enhance the overall security of their cloud services.

56. Cricket could and should have identified the risks and potential effects of collecting, maintaining, sharing, and storing Private Information in cloud environments as detailed above.

57. Without identifying the potential risks to the personal data in its possession, Cricket could not identify and implement the necessary measures to detect and prevent cyberattacks. The occurrence of the Data Breach indicates that Cricket failed to adequately implement measures to prevent cyberattacks, resulting in the exposure of Plaintiff's and Class Members' Private Information.

58. Cricket knew and understood unencrypted PI is valuable and highly sought after by cybercriminals. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the consumer data stored in cloud environments and of the foreseeable consequences if a data breach occurred, including the significant costs that would be levied upon Plaintiff and Class Members.

59. The invasion of Plaintiff's and Class Members' privacy suffered in the Data Breach constitutes an actual, particularized, redressable injury traceable to Cricket's conduct. Because of the Data Breach, Plaintiff and Class Members sustained monetary damages that exceed the sum or value of $5,000,000.00. Additionally, Plaintiff and Class Members face a substantial risk of future identity theft, fraud, or other exploitation. The substantial risk of future exploitation created by the Data Breach constitutes a redressable injury traceable to Cricket's conduct.

60. Furthermore, because Plaintiff's and Class Members' cellular data was acquired in the Data Breach, they face a substantial risk of future spam, phishing, or other attacks designed to trick them into sharing sensitive data, downloading malware, or otherwise exposing themselves to cybercrime. The substantial risk of future spam, phishing, or other exploitation attempts created by the Data Breach constitutes a redressable injury traceable to Cricket's conduct.

61. Consequently, Plaintiff and Class Members have incurred or will incur monetary damages in order to mitigate the fall-out of the Data Breach.

62. Cricket's inadequate data security practices also deprived Plaintiff and Class Members of the benefit of their bargains. When Plaintiff and Class Members paid for Cricket services, they reasonably expected that Defendant would protect their Private Information, but Cricket failed to implement the necessary data security practices.

63. Charged with handling consumer PI, Cricket knew, or should have known, the importance of safeguarding the sensitive data that was entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Cricket consumers as a result of a breach. Cricket failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

64. With respect to training, Cricket specifically failed to:

- Implement a variety of anti-ransomware training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;
- Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and
- Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

65. The PI was also maintained on a third-party cloud platform apparently vulnerable to ransomware attacks. The mechanism of the cyberattack and the potential for improper disclosure of Plaintiff and Class Members' was a known risk to Cricket, and thus Defendant was on notice that failing to take reasonable steps necessary to secure the PI from those risks left the Private Information in susceptible to access and exfiltration.

**B. The Monetary Value of Privacy Protections and Private Information**

66. The fact that Plaintiff and Class Members' Private Information was stolen means that Class Members' information is likely for sale by cybercriminals and will be misused in additional instances in the future.

67. At all relevant times, Defendant understood the Private Information it collects from Plaintiff and Class members is highly sensitive and of significant value to those who would use it for nefarious purposes.

68. Private Information is a valuable commodity to identity thieves. As the Federal Trade Commision ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[5]

69. At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[6]

70. Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[7]

---

[5] Federal Trade Commission, *Warning Signs of Identity Theft* (Sept. 2018), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft .

6 *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[7] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529 0 [hereinafter *Web's New Hot Commodity*].

71. The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[8]

72. Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[9] The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

73. Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[10]

74. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, possessing an inherent market value in both the legitimate and illegitimate markets, has been damaged and diminished by the unauthorized release.

---

[8] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

9 *Web's Hot New Commodity*, *supra* note 17.

10 *See* U.S. Dep't of Justice, *Victims of Identity Theft*, OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

75. But this change in value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Because their Private Information is now readily available, the rarity of the data has been lost, resulting in additional diminishment of value.

76. Personal information is of significant value.

77. For example, in 2019, the data brokering industry was worth approximately $200 billion.[11] Data such as names, addresses, phone numbers, and credit history has been sold in amounts ranging from $40 to $200 per record, with more sensitive personally identifiable information selling for as much as $363 per record.[12]

## C. Cricket Failed to Comply with FTC Guidelines

78. Cricket was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

79. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[13]

---

[11] *Shadowy data brokers make the most of their invisibility cloak,* https://www.latimes.com/business/story/2019-11-05/column-data-brokers 16In the Dark, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-thedark/

[12] *See, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted)

[13] *Start With Security: A Guide for Business*, FED. TRADE. COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf [hereinafter *Start with Security*].

80. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[14] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

81. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[15]

82. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

83. Cricket was at all times fully aware of its obligation to protect the Private Information of its consumers. Cricket was also aware of the significant repercussions that would result from its failure to do so.

---

[14] *Protecting Personal Information: A Guide for Business*, FED. TRADE. COMM'M (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf- 0136_proteting-personal-information.pdf.
[15] *Start with Security*, *supra* note 32.

84. As evidenced by Cricket's failure to comply with its legal obligations established by the FTC Act, Defendant failed to properly safeguard Class Members' Private Information, allowing hackers to access their private data.

**D. Damages to Plaintiff and the Class**

85. Plaintiff and the Class have been damaged by the compromise of their Private Information in the Data Breach.

86. The ramifications of Cricket's failure to keep consumers' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to the victims may continue for years, as consumer impacted by data breaches are more likely to become victims of identity fraud.[16]

87. In addition to its obligations under state and federal laws and regulations, Defendant owed a common law duty to Plaintiff and Class Members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the data in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

88. Cricket further owed and breached its duty to Plaintiff and Class Members to implement processes and specifications that would detect a breach of its security systems, including those pertaining to its third-party cloud platforms, in a timely manner and to timely act upon warnings and alerts, encompassing those generated by its own security systems.

89. As a direct result of Cricket's intentional, willful, reckless, and negligent conduct that resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize,

---

[16] *2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

and/or otherwise commit the identity theft and misuse of Plaintiff's and Class Members' Private Information as detailed above, and Plaintiff and members of the Class are at a heightened and increased substantial risk of suffering identity theft and fraud in the future.

90. The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and significant time repairing damage to their good name and credit record. Moreover, some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing, or cars because of negative information on their credit reports caused by the unauthorized use of their Private Information. In rare cases, consumers may even be arrested for crimes they did not commit.

91. Some of the injuries and risks associated with the loss of Private Information have already manifested themselves in Plaintiff's and other Class Members' lives. For instance, Plaintiff Lively has received numerous notifications of attempts to open financial accounts using his Private Information, as well as an unauthorized bank withdrawal.

92. In addition, Plaintiff Lively received a notice letter from Cricket stating that his information was released, with no explanation of the identity of the perpetrator(s), where this data could have gone, or who might have access to it. As a result, he now faces a certainly impending and substantial risk of a slew of future harm.

93. Plaintiff and the Class have suffered and/or face a substantial risk of suffering out-of-pocket losses such as fraudulent charges on online accounts, credit card fraud, applications for benefits made unlawfully in their names, loans opened in their names, medical services billed in their names, and identity theft.

94. Plaintiff and Class Members have, may have, and/or will have incurred out-of-pocket costs for protective measures, including credit monitoring services. credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

95. Plaintiff and Class Members did not receive the full benefit of their bargains when paying for wireless services, and instead received services that were of a diminished value to those described in their respective agreements with Cricket. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

96. Plaintiff and Class Members would not have obtained Defendant's services had they known that Cricket failed to properly train its employees, lacked safety controls over its platforms, and did not maintain proper data security practices to safeguard their Private Information from criminal theft and misuse.

97. Plaintiff and Class Members will continue to spend significant amounts of time monitoring their financial and related accounts for misuse.

98. As a result of the Data Breach, Plaintiff and Class members' Private Information has diminished in value.

99. The Private Information belonging to Plaintiff and Class Members is, as its name suggests, private, and was left inadequately protected by Cricket who did not obtain Plaintiff or Class Members' consent to disclose such Private Information to any other person, as required by applicable law and industry standards.

100. The Data Breach was a direct and proximate result of Cricket's failure to: (a) properly safeguard and protect Plaintiff and Class Members' Private Information from

unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

101. Cricket had the resources necessary to prevent the Data Breach, but neglected to adequately implement the necessary data security measures, despite its obligation to protect consumer data.

102. Defendant did not properly train its employees, particularly its information technology department, to timely identify and/or avoid ransomware attacks.

103. Had Cricket remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into its cloud platform and, ultimately, the theft of Plaintiff's and Class Members' Private Information.

104. As a direct and proximate result of Cricket's wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

105. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a

month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[17]

106. Other than referring Class Members to its website for more information, Cricket took no measures to assist Plaintiff and Class Members in mitigating the damage caused by its Data Breach. Thus, Defendant expended no effort to protect Plaintiff's and Class Members' Private Information.

107. Defendant's failure to adequately protect Plaintiff's and Class Members' Private Information has resulted in Plaintiff and Class Members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money–while Cricket sits by and does nothing to assist those affected by the incident it caused.

108. Because Plaintiff and Class Members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Private Information, they must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming task. Additionally, Plaintiff and Class Members have suffered the loss of the inherent value of their Private Information.

109. The Private Information stolen in the Data Breach can be misused on its own or can be combined with personal information from other sources such as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft, a fact that Cricket readily acknowledges.[18] Thieves can also use the stolen Private Information to send spear-phishing texts to Class Members to trick them into revealing sensitive

[17] *See* U.S. Dep't of Justice, *Victims of Identity Theft*, OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].
[18] *See* Cricket Addresses Illegal Download of Customer Data | Cricket Connection | Cricket Wireless

information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the message, such as login credentials, account numbers, and the like.

110. As a result of Cricket's failure to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, and are at increased risk of suffering:

- The compromise, publication, theft and/or unauthorized use of their Private Information;
- Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;
- Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;
- The continued risk to their Private Information, which remains in Cricket's possession and is subject to further breaches so long as Cricket fails to undertake appropriate measures to protect the Private Information in its possession;
- Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class members; and
- Anxiety and distress due to fear of misuse of their Private Information.

111. In addition to seeking a remedy for the previously mentioned economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

## **CLASS ACTION ALLEGATIONS**

112. Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4).

113. Specifically, Plaintiff proposes the following Class definitions:

> **Nationwide Class**
> All Cricket Wireless consumers from May 1, 2022, to October 31, 2022, and January 2, 2023, residing in the United States whose PI was accessed and acquired by an unauthorized Party due to the data breach that was reported by Cricket in July 2024.
>
> **Washington D.C. Subclass**
> All Cricket Wireless consumers from May 1, 2022, to October 31, 2022, and January 2, 2023, residing in the District of Columbia ("D.C. Subclass") whose PI was accessed and acquired by an unauthorized Party due to the data breach that was reported by Defendant in July 2024.

The above classes are hereinafter called "the Classes." Excluded from the Classes are Defendant and Defendant's affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

114. Plaintiff reserves the right to modify, change, amend, or expand the definition of the Classes based upon discovery and further investigation.

115. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

116. **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that joinder of all Class members would be impracticable. On information and belief, the Classes number in the millions. Moreover, the Classes are composed of an easily

ascertainable set of individuals and entities who were Cricket consumers during the relevant periods and who were impacted by the Data Breach. The precise number of Class Members can be further confirmed through discovery, which includes Defendant's records. The disposition of Plaintiff and Class Members' claims through a class action will benefit the parties and this Court.

117. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual members of the Classes. Such common questions of law or fact include, *inter alia*:

- Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;
- Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;
- Whether Defendant properly implemented its purported security measures to protect Plaintiff and the Classes' Private Information from unauthorized capture, dissemination, and misuse;
- Whether Defendant took reasonable measures to determine the extent of the Data Breach after it first learned of same;
- Whether Defendant disclosed Plaintiff and the Classes' Private Information in violation of the understanding that the Private Information was being disclosed in confidence and should be maintained;
- Whether Defendant willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff and the Classes' Private Information;
- Whether Defendant was negligent in failing to properly secure and protect Plaintiff and the Classes' Private Information;
- Whether Defendant was unjustly enriched by its actions; and

- Whether Plaintiff and the other members of the Classes' are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

118. Cricket engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of themselves and other members of the Classes. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison in both quality and quantity, to the numerous common questions that predominate in this action.

119. **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, all Class members were similarly injured and sustained similar monetary and economic injuries as a result of Defendant's uniform misconduct described above and were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendant that are unique to Plaintiff.

120. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Classes he seeks to represent, he retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff and his counsel.

121. **Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted and/or refused to act on grounds that apply generally to the Classes, making injunctive and/or declaratory relief appropriate with respect to the Classes under Fed. Civ. P. 23 (b)(2).

122. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy,

and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct. Even if members of the Classes could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

123. Class certification is also appropriate under Rules 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendant;

b. The prosecution of separate actions by individual Class members would create a risk of adjudication that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests; and

c. Defendant has acted and refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the members of the Classes as a whole.

124. Class certification is also appropriate because this Court can designate particular claims or issues for class-wide treatment and may designate multiple subclasses pursuant to Fed. R. Civ. P. 23(c)(4).

125. No unusual difficulties are likely to be encountered in the management of this matter as a class action.

## CAUSES OF ACTION

### COUNT I
**Negligence**
**(On Behalf of Plaintiff and all Classes)**

126. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

127. Upon Cricket's accepting and storing the Private Information of Plaintiff and the Class Members on its cloud platform, Defendant undertook and owed a duty to Plaintiff and the Classes to exercise reasonable care to secure and safeguard that sensitive information and to use commercially reasonable methods to do so. Defendant knew that the Private Information was private and confidential and should be protected accordingly.

128. In sum, Cricket owed a duty of care not to subject Plaintiff and the Classes' Private Information to an unreasonable risk of exposure and theft because Plaintiff and the Classes were foreseeable and probable victims of any inadequate security practices.

129. Defendant owed numerous duties to Plaintiff and the Classes, including the following:

- to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in its possession;

- to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and
- to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

130. Cricket also breached its duty to Plaintiff and Class Members to adequately protect and safeguard Private Information by disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Private Information. Furthering its dilatory practices, Defendant failed to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, despite the known risk and foreseeable likelihood of breach and misuse that permitted a malicious third-party to gain access to Plaintiff's and Class Members' Private Information and potentially misuse that data, and intentionally disclose it to others without consent.

131. Cricket knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security. Defendant knew or should have known about numerous well-publicized data breaches within the telecommunications industry.

132. Defendant knew, or should have known, that its cloud platforms did not adequately safeguard Plaintiff and Class Members' Private Information.

133. Defendant breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate data security practices to safeguard Plaintiff and Class Members' Private Information.

134. Because Cricket knew that a breach would damage millions of its consumers, including Plaintiff and Class Members, Defendant had a duty to adequately protect its data systems and the Private Information contained therein.

135. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

136. Cricket's duty to use reasonable care in protecting private data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect Private Information.

137. Cricket's own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included failing to: (1) secure Plaintiff and Class Members' Private Information; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

138. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information, and by failing to provide timely notice of the Data Breach. The specific negligent acts and omissions committed by Cricket include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of Defendant's networks and systems;

c. Allowing unauthorized access to Class Members' Private Information;

d. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

e. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

139. Through Defendant's acts and omissions described in this Complaint, including its failure to provide adequate security and failure to protect Plaintiff and Class Members' Private Information from being foreseeably captured, accessed, disseminated, stolen and misused, Cricket unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiff and Class Members' Private Information while within Cricket's possession or control.

140. Defendant's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to failing to adequately protect the Private Information and failing to provide Plaintiff and Class Members with timely notice that their Private Information had been compromised.

141. Neither Plaintiff nor the other Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

142. As a direct and proximate result of Cricket's conduct, Plaintiff and Class Members suffered damages as alleged above.

143. Plaintiff and Class Members are also entitled to injunctive relief requiring Cricket to, *e.g.*, (i) strengthen data security systems and monitoring procedures, including those related to its third-party cloud platforms; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide lifetime free credit monitoring to all Class Members.

**COUNT II**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Classes)**

144. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

145. In the ordinary course of its business, Cricket requires its consumers to provide their Private Information.

146. Via its Privacy Policy, Cricket declared its intention to protect the Private Information gathered from consumers.

147. Through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for the provision of wireless services, as well as implied contracts for Cricket to implement data security measures sufficient to safeguard and protect the privacy of Plaintiff and Class Members' Private Information.

148. Specifically, Plaintiff entered into a valid and enforceable implied contract with Defendant when he first became a Cricket consumer in 2022.

149. The valid and enforceable implied contracts to provide wireless services to Plaintiff and Class Members include Cricket's promise to protect consumers' Private Information given to Defendant (or that Defendant created on its own) from disclosure.

150. When Plaintiff and Class Members provided their Private Information to Defendant in exchange for Cricket's services, they entered into implied contracts with Defendant pursuant to which Cricket agreed to reasonably protect such information.

151. Plaintiff and Class Members would not have entrusted their PI to Cricket in the absence of an express or implied promise to implement reasonable data protection measures for said Information.

152. Plaintiff and Class Members fully performed their obligations pursuant to the implied contracts.

153. Defendant breached the aforesaid implied contracts when it allowed unauthorized access to the Private Information Plaintiff and Class Members reasonably entrusted to it.

154. As a direct and proximate result of Cricket's breach of the implied contract, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of the benefit of the bargain; (vi) an increase in spam calls, and/or texts; (vii) the continued and increased risk of fraud and/or misuse; (viii) nominal damages; and (IX) monetary damages associated with mitigating the consequences of the Data Breach.

155. Defendant solicited and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class members accepted Defendant's offers and provided their Private Information to Defendant.

156. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

157. Class Members who paid money to Cricket reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

158. Cricket's express representations, including, but not limited to the express representations found in its Privacy Policy, memorializes and embodies the implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff and Class Members' Private Information.

159. A meeting of the minds occurred, as Plaintiff and Class Members agreed and provided their Private Information to Cricket paid for wireless services in exchange for, among other things, both the provision of those services and the protection of their Private Information.

160. Plaintiff and Class members performed their obligations under the contract when they paid for Cricket's services and provided their Private Information.

161. Cricket materially breached its contractual obligation to protect the Private Information it gathered when the information was accessed and exfiltrated in the Data Breach.

162. Further, Cricket materially breached the terms of the implied contracts, including, but not limited to, the terms stated in the relevant privacy policy. Defendant did not maintain the privacy of Plaintiff and Class members' Private Information as evidenced by its notifications of the Data Breach to affected consumers. Specifically, Cricket did not comply with industry standards, standards of conduct embodied in statutes like Section 5 of the FTCA, or otherwise protect Plaintiff and Class Members' Private Information as set forth above.

163. The Data Breach was a reasonably foreseeable consequence of Cricket's actions in breach of these contracts.

164. As a result of Cricket's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received services that were of diminished value. Plaintiff and Class Members, therefore, were damaged in an amount at least equal to the difference in the value between the wireless services with data security protection they paid for and the wireless services they received.

165. Had Cricket disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, Class Members, nor any reasonable person would have purchased wireless services from Defendant.

166. As a direct and proximate result of the Data Breach, Plaintiff and Class Members will suffer actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, out of pocket expenses, and the loss of the benefit of the bargain they had struck with Cricket.

167. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

168. Plaintiff and Class Members are also entitled to injunctive relief requiring Cricking to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiff and all Classes)**

169. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

170. By providing their PI, Plaintiff and Class Members conferred a monetary benefit upon Cricket, wherein Defendant used the Private Information to market, advertise, and sell additional services to its consumers.

171. Cricket recognized that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit.

172. By collecting the Private Information, Cricket was therefore obligated to safeguard and protect the data, to keep such information confidential, and to timely notify Plaintiff and Class Members if their Private Information had been compromised.

173. Because Cricket failed to secure Plaintiff's and Class Members' Private Information, it would be unjust for Defendant to retain any of the benefits that Plaintiff and Class Members conferred upon it without paying value in return.

174. As a direct and proximate result of Cricket's conduct, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of the benefit of the bargain; (vi) an increase in spam calls, and/or texts; (vii) the continued and increased risk of fraud and/or misuse; (viii) nominal damages; and (IX) monetary damages associated with mitigating the consequences of the Data Breach.

175. Plaintiff and Class Members are entitled to refunds, restitution, and damages, and/or an order proportionally disgorging all profits and benefits Cricket obtained by way of its wrongful conduct.

## COUNT IV
## Invasion of Privacy
## (On Behalf of Plaintiff and all Classes)

176. Plaintiff re-alleges and incorporates by reference the paragraphs above as though fully set forth herein.

177. Plaintiff and Class Members provided and entrusted Cricket with their Private Information.

178. Plaintiff and Class Members entrusted their PI to Defendant on the premise and understanding that it would safeguard their information, use their PI for business purposes only, and to not disclose their Private Information to unauthorized third parties.

179. Cricket owed a duty to the individuals for whom it maintained and stored information (including Plaintiff and Class Members) to keep their PI confidential.

180. Cricket failed to protect and in fact released Plaintiff's and Class Members' Private Information to an unauthorized third-party.

181. Cricket's failure to protect consumers' PI allowed the unauthorized third-party to access, examine and/or exfiltrate the Private Information.

182. The unauthorized release to, custody of, and examination by an unauthorized third-party of Plaintiff's and Class Members' PI is highly offensive to a reasonable person.

183. Plaintiff and Class Members disclosed their PI to Cricket in furtherance of their business relationships with Defendant, but with an intention that the PI would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and not be disclosed without their authorization.

184. Cricket's Data Breach constitutes an intentional interference with Plaintiff's and the Classes' interest in solitude or seclusion, as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

185. Defendant acted with a knowing state of mind when it allowed the Data Breach to occur because Cricket possessed actual knowledge that its information security practices were inadequate and insufficient.

186. Because Cricket acted with this knowing state of mind, it had notice the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and Class Members.

187. As a proximate result of the above acts and omissions of Defendant, the Private Information of Plaintiff and Class Members was accessed by a third-party without authorization, causing Plaintiff and the Classes to suffer damages.

188. Unless and until enjoined and restrained by order of this Court, Cricket's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Classes in that the PI maintained by Cricket can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy.

189. Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

## COUNT V
**Unauthorized Disclosure of Customer Proprietary Network Information**
**42 U.S.C. § 222 (Privacy of customer information)**
**(On Behalf of Plaintiff and all Classes)**

190. Plaintiff re-alleges and incorporates by reference the paragraphs above as though fully set forth herein.

191. Upon information and belief, during the ordinary course of its business, Cricket collects customer proprietary network information relating to the quantity, technical configuration, type, destination, location, and amount of use of the telecommunications service subscribed to by its consumers, including Plaintiff and Class Members.

192. Under 47 U.S.C. § 222 (Privacy of customer information), Cricket has a duty to protect the confidentiality of customer proprietary network information and is prohibited from disclosure, except as required by law or with the customer's permission.

193. Cricket failed to protect the confidentiality of Plaintiff's and Class Members' Private Information, resulting in customer proprietary information being disclosed to an unauthorized third-party between May 1, 2022, October 31, 2022, and January 2, 2023.

194. Cricket breached its duties to Plaintiff and Class Members under 47 U.S.C. § 222 by failing to provide fair, reasonable, or adequate computer systems and data security practices as to protect customer proprietary information.

195. Particularly, Cricket breached its duty to: (i) conduct privacy impact assessments for each cloud services vendor; (ii) examine each vendor's reputation regarding data breaches; (iii) determine whether each vendor has obtained industry certifications for their privacy practices; (iv) assess whether each vendor has adequate security measures (technical and administrative) to protect the data being shared; (v) ensure each vendor is contractually obligated to comply with the requirements of Cricket's Privacy Policy or other privacy/security obligations concerning the relevant data; and, (vi) monitor the vendor's practices, annually, to ensure they continue to comply with its contractual privacy obligations and industry best practices.

196. As a direct and proximate result of Cricket's conduct, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include, but may not be limited to: ongoing, imminent, and certainly impending targeted messaging (i.e., texts and calls) designed to deceive Plaintiff and Class Members into disclosing Private Information, or otherwise perpetrate identity theft, fraud, and other exploitation, causing economic harm and loss of time spent mitigating the consequences of the Data Breach; the lost

value of the customer proprietary information; the amount of identity theft protection services, credit monitoring services, and dark web monitoring services, the lost benefit of the bargain and overcharges for services or products; nominal and monetary damages, and other economic and noneconomic harm.

197. Thus, Cricket's failure to adequately safeguard Plaintiff's and Class Members' customer proprietary information from impermissible disclosure, renders it liable for all damages Plaintiff and Class Members sustained (and will sustain) as a result of Cricket's violations, including attorneys' fees and costs.

**COUNT VI**
**VIOLATION OF DC CODE § 28-3905:**
**UNFAIR AND DECEPTIVE TRADE PRACTICES**
**(On Behalf of Plaintiff and all Classes)**

198. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

199. Plaintiff, on behalf of himself individually and on behalf of all others similarly situated, files this action pursuant to D.C. Code § 28-3905(k).

200. The District of Columbia Consumer Protection Procedures Act ("CPPA") prohibits unlawful trade practices in connection with the offer, lease, and supply of consumer goods. § 28-3901(a)(6). Consumer goods include telecommunication services. 28-3901(a)(7).

201. The CPPA defines a "merchant" as "a person, whether organized or operating for profit or for nonprofit purpose, who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who in the ordinary course of business does or would supply the goods or services which are or would be the subject matter of a trade practice." D.C. Code § 28-3901(a)(3).

202. Cricket is a merchant under the CPPA, as it provides telecommunication services and sells related products.

203. The CPPA defines a "consumer" as a person who "does or would purchase, lease (as lessee), or receive consumer goods...or does or would otherwise provide the economic demand for a trade practice." D.C. Code § 28-3901(a)(2).

204. Under the CPPA, it is an unlawful trade practice to:

a. represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;
b. represent that goods or services are of a particular standard, quality, grade, style, or model, if, in fact, they are of another;
c. misrepresent as to a material fact which has a tendency to mislead;
d. fail to state a material fact if such failure tends to mislead; and,
e. use innuendo or ambiguity as to a material fact, which has a tendency to mislead. D.C. Code § 28-3904.

205. Cricket violated the CPPA by, among other things:

a. Representing and misrepresenting, expressly and implicitly, that Cricket's privacy and security practices were sufficient to ensure the safety of Plaintiff and Class Members' Private Information;
b. Representing and misrepresenting, expressly and implicitly, that Cricket complied with all applicable laws concerning the maintenance and protection of Private Information.
c. Representing and misrepresenting that Cricket would take affirmative steps to ensure the security of Plaintiff and Class Members' Private Information.

206. Cricket intentionally made these misrepresentations or omissions knowing they would mislead reasonable consumers, such as Plaintiff.

207. These misrepresentations and omissions had the capacity and tendency to mislead consumers.

208. D.C. Code § 28-3901(c) establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be received in the District of Columbia.

209. Cricket's unfair and deceptive acts and omissions were flagrant and willful, and created an imminent danger to Plaintiff and Class Members.

210. Cricket's acts and omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, and unscrupulous; and (3) cause substantial injury to consumers.

211. Cricket's acts and omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that could not have been reasonably avoided by consumers.

212. As a result of Cricket's unfair and deceptive trade practices detailed herein, Plaintiff and the Classes have suffered substantial injury including, but not limited to, paying more for wireless services than they otherwise would have had they known Cricket would not secure their Private Information; increased likelihood of fraud and misuse of their Private Information; spending time and resources preventing and alleviating fraud and misuse of their personal data; and expending time and resources attempting to compel Cricket to perform its legally-required duties.

213. As a result of Cricket's unfair and deceptive trade practices, Plaintiff seeks on behalf of himself and the DC Subclass:

A. An injunction against Cricket, requiring it to encrypt all consumer personal information stored on Snowflake and any other third-party cloud platform, or that Cricket modifies its privacy policy to accurately reflect its data security practices;

B. Additional relief to restore to its consumers money which was acquired by means of the unlawful trade practices within the District of Columbia;

C. Punitive damages;

D. $1,500 per violation or treble damages, whichever is greater;

E. Reasonable attorney's fees;

F. All other statutory relief the Court deems proper under D.C. Code § 28-3905(k)(1)(A).

**COUNT VII**
**INJUNCTIVE/DECLARATORY RELIEF**
**(On Behalf of Plaintiff and all Classes)**

214. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

215. An actual controversy has arisen in the wake of the Data Breach regarding Cricket's present and prospective common law and other duties to reasonably safeguard Plaintiff and Class Members' PI, and whether Cricket is currently maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their Private Information. Plaintiff and the Classes remain at imminent risk that further compromises of their PI will occur in the future.

216. The Court should also issue prospective injunctive relief requiring Cricket to employ adequate security practices consistent with law and industry standards to protect consumers' Private Information.

217. Cricket still possesses the Private Information of Plaintiff and the Classes.

218. To Plaintiff's knowledge, Cricket has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that caused the Data Breach.

219. If an injunction is not issued, Plaintiff and the Classes will suffer irreparable injury and lack an adequate legal remedy in the event of another Cricket data breach.

220. The risk of another such data incident is real, immediate, and substantial.

221. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Cricket if an injunction is issued. Among other things, if Cricket suffers another data breach, Plaintiff and Class Members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Cricket of complying with an injunction by employing reasonable prospective data security measures it should have implemented in the first place is relatively minimal.

222. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Cricket, thus eliminating the additional injuries that would result to Plaintiff and Class Members, along with other consumers whose PI would be further compromised.

223. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Cricket implement and maintain reasonable security measures, including but not limited to the following:

a. Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Cricket's systems, including its third-party cloud platforms, on a periodic basis, and ordering Cricket to promptly correct any problems or issues detected by such third-party security auditors;

b. engaging third-party security auditors and internal personnel to run automated security monitoring;

c. auditing, testing, and training its security personnel regarding any new or modified procedures;

d. purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

e. conducting regular database scans and security checks; and

f. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Classes proposed in this Complaint, respectfully requests that the Court enter judgment in favor of Plaintiff and the Classes and against Defendant, as follows:

A. For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Classes;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff and

Class Members' Private Information, and from failing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. For equitable relief compelling Cricket to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Cricket's wrongful conduct;

E. Ordering Cricket to pay for no less than three (3) years of credit monitoring services to Plaintiff and the Classes;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages, as allowable by law;

H. For an award of attorneys' fees and costs, and any other expenses, including expert witness fees (if applicable);

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 24, 2024

Respectfully submitted,

*/s/ Jason S. Rathod*

Nicholas A. Migliaccio
Jason Rathod
**MIGLIACCIO & RATHOD LLP**
412 H Street NE
Washington D.C. 20002

Telephone: (202) 470-3520
*nmigliaccio@classlawdc.com*
*jrathod@classlawdc.com*

*Attorneys for Plaintiffs*